**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:25-cv-00135-MR-WCM**

| | | |
|---|---|---|
| **CHRISTOPHER MOONEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **AVL GRILLE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 50] and the Plaintiff's Motion to File under Seal [Doc. 55].

## I.    PROCEDURAL BACKGROUND

On May 2, 2025, the Plaintiff Christopher R. Mooney, proceeding *pro se*, initiated this action by filing a Complaint against the Defendant AVL Grille, Inc. asserting various civil rights violations arising from the Plaintiff's employment with the Defendant.  [Doc. 1].  The Defendant filed an Answer on June 27, 2025.  [Doc. 7].  On June 9, 2026, the Defendant moved for summary judgment.  [Doc. 50].  On July 13, 2026, the Plaintiff filed a brief in opposition to the Defendant's motion, as well as the present motion to seal.

[Docs. 54, 55]. The Defendant filed a Reply on July 16, 2026. [Doc. 57]. Having been fully briefed, this matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). "Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). When ruling on a motion for summary judgment, the Court does not "weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568-69 (4th Cir. 2015). The Court also "need not accept as true unwarranted

2

inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assocs., LLP, 213 F.3d 175, 180 (4th Cir. 2000).

## III. FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

The Plaintiff identifies as "an African American Black Male" who was "born in America and is a United States Citizen." [Doc. 50-9 at 1]. The Plaintiff began working as a dishwasher for the Defendant restaurant, which does business as Post 25 Kitchen and Lounge, in the summer of 2022. [Doc. 50-4 at 5; Doc. 50-5 at 1; Doc. 50-6 at 1]. The Plaintiff subsequently worked his way up to the role of line cook. [Doc 50-3 at 17].

On June 18, 2024, the Plaintiff worked a shift for the Defendant at the restaurant's pizza station. [Id. at 13]. Toward the end of that shift, the Plaintiff left dishes at the "dish pit" where Wade Bethea, an African American male like the Plaintiff, was working as a dishwasher. [Id. at 13, 16]. When the Plaintiff returned to the pizza station, Bethea followed him and "began to shove [the Plaintiff's] shoulder and push [the Plaintiff's] arm and talk loudly into [the Plaintiff's] face, with spit coming out of [Bethea's] mouth, going onto [the Plaintiff's] face." [Id. at 14]. The Plaintiff does not know why Bethea followed him, and he and Bethea had never had prior disagreements. [Id. at

3

13-14]. The Plaintiff then walked away from the pizza station, taking more dishes to the dish pit. [Id. at 14]. Bethea continued following the Plaintiff, yelling obscenities at him and using racially derogatory slurs. [Id.]. The Plaintiff tried to create space by walking outside, but Bethea followed him outside and continued acting aggressively toward the Plaintiff. [Id.]. The Plaintiff then returned inside the restaurant, informed his supervisor about the incident, and asked his supervisor to calm Bethea down. [Id.]. The Plaintiff then left the restaurant for the night, as he had completed his closing duties. [Id.].

Later that evening, around 1:00 a.m. on June 19, 2024, the Plaintiff sent his manager a series of text messages describing the incident with Bethea. [Doc. 50-5 at 41-42]. The Plaintiff told his manager that earlier in the shift Bethea had made a comment to the Plaintiff about the Plaintiff living with his mother. [Id. at 41]. The Plaintiff said that when he took dishes to the dish pit, the Plaintiff "didn't put [the dishes] where [Bethea] wanted [the Plaintiff] to put them," and Bethea "chased [him] from the dish pit yelling . . . you know where to put those dishes." [Id. at 41-42]. The Plaintiff also recounted that Bethea spit on the Plaintiff, "pushed" him, cursed at him, and said derogatory slurs to him. [Id.]. However, the Plaintiff then said that "honestly [he was] not worried about [Bethea]." [Id. at 42]. Instead, the

Plaintiff was "more concerned about who talked to [Bethea] about [the] fact [the Plaintiff] live[s] at home with [his] ma." [Id.]  In the final two messages to his manager that evening, the Plaintiff said that he did not want Bethea to "lose his job" and that he forgave Bethea.  [Id.].

The Plaintiff returned to the restaurant around 4:00 p.m. the next day, June 19, 2024, to work his next shift.  [Id. at 43].  At 4:59 p.m., however, the Plaintiff texted his manager that he was trying to get his shift covered before Bethea showed up to work because he did not want to have another incident with Bethea, and because neither his manager nor the supervisor from the prior evening was at the restaurant to address the issue with Bethea.  [Id. at 42].  The Plaintiff texted his manager that he "need[ed] [his manager] to call someone to cover for [him] please."  [Id.].  One of the Plaintiff's supervisors then told Bethea not to work that evening so that the Plaintiff and Bethea would not be working together.  [Id. at 43; Doc. 50-8 at 2-3].  Nevertheless, the Plaintiff left work around 5:30 p.m., well before the end of his shift.  [Doc. 50-5 at 43].  The Plaintiff later texted his manager that he had left around 5:30 p.m. but that he was "not abandoning [his] job or quitting by taking tonight off but it is a good choice considering last night."  [Id.].

Two days later, on June 21, 2024, the Plaintiff's manager responded to the Plaintiff and said that the Plaintiff "did abandon [his] job," and that "[b]y

5

deciding to leave after the issue had been resolved, [the restaurant] ended up short a line cook and a dishwasher." [Id.]. The Plaintiff's manager said that the Plaintiff's conduct "displayed that [the Plaintiff was] ok to leave the crew high and dry on what should have been an otherwise easy night." [Id.]. The Plaintiff's manager then informed the Plaintiff that he had met with the management staff and they "unanimously agreed" that the Plaintiff's employment should be terminated. [Id.]. The Plaintiff's manager said that the Plaintiff's termination was "not a decision based on what occurred on Tuesday night with the dishwasher, but rather a decision based on the continued incidences involving [the Plaintiff] and other team members," as well as the Plaintiff's decision to "leave the crew high and dry" on June 19, 2024 by leaving work early when the restaurant was "already short staffed" and Bethea was told not to work. [Id.].

On December 17, 2024, the Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). [Doc. 50-9 at 1-2]. The Charge asserts that the Plaintiff was discriminated against based on his race, color, sex, and national origin. [Id. at 1]. The Charge alleges that, on June 18, 2024, the Plaintiff's coworker "assaulted" the Plaintiff "by pushing [him], striking [his] arm, and spitting into [his] face," that the coworker did not lose his job, and that the "employer did not stop the

incident and did not properly report the incident." [Id.]. The Charge further alleges that the employer subsequently "said the [Plaintiff] must work with the other employee" that assaulted him, and the Plaintiff "did not work the shift with the other employee that assaulted [the Plaintiff] due to a hostile work environment." [Id. at 2]. The Charge then alleges that on June 21, 2024, "the employer terminated the [Plaintiff] based on the events that took place on June 18th, 2024, with another employee." [Id.]. The Charge specifically identifies "wrongful termination" and "hostile work environment" as two bases for the Plaintiff's complaint. [Id. at 1]. The Charge further alleges that the Plaintiff's employer has limited the Plaintiff's access to the Plaintiff's payroll information since his termination. [Id. at 2]. The Charge does not allege that the Plaintiff has a disability or that the Plaintiff was subjected to any workplace hazards. See [Id. at 1-2]. On February 3, 2025, the EEOC closed its investigation of the Plaintiff's charge without making any findings as to the merits of the Plaintiff's claims and provided the Plaintiff notice of his right to sue within ninety days. [Doc. 50-11 at 1]. On May 2, 2025, the Plaintiff timely filed his Complaint. [Doc. 1].

## IV. DISCUSSION

### A. Claims in the Plaintiff's "Complaint #2"

As a preliminary matter, the Court must interpret the Plaintiff's filings to determine what claims the Plaintiff has asserted against the Defendant. When the Plaintiff filed his Complaint, he simultaneously filed a document styled as "Complaint #2." [Doc. 1-1]. The Plaintiff's Complaint asserts employment discrimination claims under Title VII of the Civil Rights Act. [Doc. 1 at 1-2]. The Plaintiff's "Complaint #2," however, asserts nine bases for the Plaintiff's employment discrimination suit: (1) "Title VII of the Civil Rights Act of 1964 and Civil Rights Act of 1991," (2) "Title 29 U.S.C. Duties of employers and employees," (3) "Title 42 U.S.C. 2000e-2 – Unlawful Employment Practices," (4) Title 42 U.S.C. 2000e-3 – Other Unlawful Employment Practices," (5) "Fair Labor Standards Act, coded 29 CFR 516.5," (6) "N.C. General Statute Chapter 95, Article 16, Occupational Safety and Health Act of North Carolina," (7) "N.C. General Statute Chapter 168A-5, Discrimination in Employment," (8) "North Carolina Equal Employment Practices Act," and (9) "North Carolina Administrative Code, 25 NCAC 01J.1101." [Id. at 1-2]. The question before the Court is whether the Plaintiff's "Complaint #2" plausibly asserts any distinct claims in addition to the claims asserted in the Plaintiff's Complaint, and, if so, whether the

8

Plaintiff has forecast evidence sufficient for a reasonable jury to find that the Plaintiff is entitled to relief on any of those claims.

"A pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Here, the Court construes the Plaintiff's "Complaint #2" liberally and reads "Complaint #2," which is wholly devoid of factual allegations, together with the factual allegations in the Plaintiff's Complaint to determine whether the Plaintiff could be entitled to relief pursuant to any of the bases asserted by the Plaintiff in "Complaint #2" that were not asserted in the Plaintiff's Complaint. Because the first, third, and fourth bases asserted in "Complaint #2" all implicate Title VII, consistent with the Plaintiff's Complaint, the Court does not address those bases here and instead addresses the Plaintiff's Title VII claims infra.

As to the Plaintiff's second basis, the Plaintiff has failed to identify a particular provision of the Occupational Safety and Health Act ("OSHA") under which his claim arises, and OSHA does not provide for employment discrimination claims. The Plaintiff has neither alleged nor forecast any evidence that the Defendant exposed him to any "recognized hazards that

9

are causing or are likely to cause death or serious physical harm," nor has the Plaintiff alleged facts or forecast any evidence to support any other predicate for an OSHA claim. 29 U.S.C. § 654(a)(1). Accordingly, the Court will grant summary judgment to the Defendant as to the Plaintiff's OSHA claim.

As to the Plaintiff's fifth basis, 29 C.F.R. § 516.5 is a recordkeeping regulation implementing the Fair Labor Standards Act ("FLSA"). The only allegation in the Plaintiff's Complaint relevant to this provision is that the Defendant "limited or has not allowed any access to the complainants payroll stub in a printable manner." [Doc. 1 at ¶ 17 (error uncorrected)]. The only relevant evidence forecast by the Plaintiff as to this claim is the Plaintiff's deposition testimony that, once his employment was terminated, he was no longer able to access his payroll information via the online portal that he had previously used to access that information. [Doc. 50-3 at 19].

The Plaintiff previously asserted a similar claim under 29 C.F.R. § 516.5 in a similar employment discrimination suit in this district against a prior employer of the Plaintiff. See generally Mooney v. Advanced Bus. Equip., No. 1:20-CV-378-MOC, 2021 WL 1553821 (W.D.N.C. Apr. 20, 2021). In that case, the court explained that "district courts within several circuits (including the Fourth Circuit) have found that the FLSA's recordkeeping

provision does not create a private right of action." Id. at *2. As a result, the court dismissed the Plaintiff's FLSA recordkeeping claim. Id. at *2 (collecting cases). The relevant law has not changed since the Plaintiff's prior attempt to assert a claim under 29 C.F.R. § 516.5. See, e.g., Frechette v. Blue Ridge Hospice, No. 5:24-CV-00051, 2024 WL 4775101, at *5 (W.D. Va. Nov. 13, 2024) ("FLSA does not provide a private right of action for violations of the recordkeeping requirements.") (collecting cases). Accordingly, the Court will grant summary judgment to the Defendant as to the Plaintiff's FSLA recordkeeping claim.

As to the Plaintiff's sixth basis, the Plaintiff has failed to identify a particular provision of the Occupational Safety and Health Act of North Carolina ("NC OSHA") under which his claim arises, and NC OSHA does not provide for employment discrimination claims. The Plaintiff has neither alleged nor forecast any evidence that the Defendant exposed him to any "recognized hazards that are causing or are likely to cause death or serious injury," nor has the Plaintiff alleged facts or forecast any evidence to support any other predicate for an NC OSHA claim. N.C. Gen. Stat. § 95-129(1). Accordingly, the Court will grant summary judgment to the Defendant as to the Plaintiff's NC OSHA claim.

As to the Plaintiff's seventh basis, the North Carolina Persons with Disabilities Protection Act ("NC PWDPA") prohibits an employer from discriminating "against a qualified person with a disability on the basis of a disabling condition." N.C. Gen. Stat. § 168A-5(a)(1). The Plaintiff, however, has neither alleged nor forecast any evidence that he has a disability or that he was discriminated against based on a disabling condition. Accordingly, the Court will grant summary judgment to the Defendant as to the Plaintiff's NC PWDPA claim.

As to the Plaintiff's eighth basis, the Plaintiff failed to identify a particular provision of the North Carolina Equal Employment Practices Act ("NCEEPA") under which his claim arises. The Fourth Circuit has held that "[n]either the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA." Smith v. First Union Nat. Bank, 202 F.3d 234, 247 (4th Cir. 2000). Instead, "[i]n enacting the Equal Employment Practices Act, the North Carolina legislature chose not to provide any remedies beyond those available under federal discrimination statutes." Percell v. Int'l Bus. Machines, Inc., 765 F. Supp. 297, 302 (E.D.N.C. 1991), aff'd sub nom. Percell v. Int'l Bus. Machines Corp., 23 F.3d 402 (4th Cir. 1994). Moreover, the "plaintiff has cited no authority showing that a private cause of action exists under the [NCEEPA]."

12

Bendross v. Town of Huntersville, 159 N.C. App. 228, 582 S.E.2d 726 (2003). Accordingly, the Court will grant summary judgment to the Defendant as to the Plaintiff's NCEEPA claim.

Finally, as to the Plaintiff's ninth basis, 25 N.C. Admin. Code 1J.1101 applies only in the context of "state employees or applicants." 25 N.C. Admin. Code 1J.1101(a). The Plaintiff's allegations, however, concern only his employment at a private restaurant, not any state employment. Accordingly, the Court will grant summary judgment to the Defendant as to the Plaintiff's claim pursuant to 25 N.C. Admin. Code 1J.1101.

In sum, the Court concludes that the Plaintiff's "Complaint #2" fails to assert any plausible claim for relief that is distinct from the Title VII claims asserted in the Plaintiff's Complaint, and the Plaintiff has failed to present a forecast of evidence that could arguably support such claims. The Court will therefore grant summary judgment in favor of the Defendant as to the Plaintiff's OSHA, FLSA, NC OSHA, NC PWDPA, NCEEPA, and North Carolina Administrative Code claims, and those claims will be dismissed with prejudice.

## B. Title VII Claims

Fourth Circuit precedent establishes that "before filing suit under Title VII . . . , a plaintiff must exhaust her administrative remedies by bringing a

charge with the EEOC." Walton v. Harker, 33 F.4th 165, 172 (4th Cir. 2022). The "EEOC charge defines the scope" of a plaintiff's right to sue, id. (quoting Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000)), so "[t]he allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint," id. (quoting Hentosh v. Old Dominion Univ., 767 F.3d 413, 416 (4th Cir. 2014)). As a result, a plaintiff's factual allegations in litigation "must correspond to those set forth in the administrative charge." Id. (quoting Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005)). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII . . . suit." Id. (quoting Stewart v. Iancu, 912 F.3d 693, 705 (4th Cir. 2019)). Claims that "exceed the scope of the EEOC charge and any charges that would naturally have arisen from investigation thereof . . . are procedurally barred." Id. (quoting Chacko, 429 F.3d at 509).

Here, the Plaintiff's Charge asserts discrimination based on race, color, sex, and national origin against the Plaintiff pursuant to the June 18, 2024 incident with Bethea and the Plaintiff's subsequent termination on June 21, 2024. [Doc. 50-9 at 1]. The Plaintiff's Complaint, consistent with the Charge,

asserts hostile work environment and wrongful termination claims pursuant to Title VII's anti-discrimination provision, 42 U.S.C. § 2000e-2. [Doc. 1; Doc. 50-3 at 19].[1] It is unclear, however, whether the Plaintiff also intends to assert a retaliatory termination claim pursuant to Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3. While the Plaintiff never expressly alleges retaliation, the Plaintiff's "Complaint #2" does refer to Title VII's anti-retaliation provision as a basis for the Plaintiff's suit, [Doc. 1-1 at 2], and the Charge alleges that the Plaintiff's employment was terminated "based on the events that took place on June 18th, 2024," [Doc. 50-9 at 2]. Liberally construing the Plaintiff's filings, the Court will also address retaliatory termination. The Court concludes that the Plaintiff has properly exhausted his administrative remedies as to his Title VII claims for hostile work environment, wrongful termination, and retaliatory termination.

### 1. Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

---

[1] The Plaintiff's "Complaint #2" also asserts that the Plaintiff was discriminated against based on "minority status" and "education," but neither basis was asserted in the Plaintiff's Charge, and neither basis is a protected characteristic under Title VII, so the Court concludes that the Plaintiff is procedurally barred from asserting independent claims based on "minority status" and "education."

15

national origin." 42 U.S.C. § 2000e–2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." EEOC v. R&R Ventures, 244 F.3d 334, 338 (4th Cir. 2001). "A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To establish a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristics]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir. 2011) (internal quotation marks omitted). The question before the Court is whether a reasonable jury, viewing the forecast of evidence in the light most favorable to the Plaintiff, could find facts sufficient to establish the elements of the Plaintiff's hostile work environment claim.

As to the first element, which concerns unwelcome conduct, the Plaintiff represents that "[t]he hostile work environment actions took place on

June 18th, 2024."[2]  [Doc. 54 at 2]; see also [id. at 2-3 (representing that the Plaintiff's claim is "not based upon" a July 2023 incident involving the Plaintiff and is instead based on the "18 June 2024" incident and the "termination that occurred on 21 June 2024").  The unwelcome conduct at issue is therefore solely the June 18, 2024 incident, during which Bethea hit, spit upon, and verbally abused the Plaintiff.

As to the second element, which concerns whether the unwelcome conduct was based on the Plaintiff's protected characteristics, the Plaintiff testified during his deposition that Bethea, an African American male like the Plaintiff, used a racially derogatory slur while yelling at the Plaintiff.  [Doc.

---

[2] The Plaintiff's Charge and pleadings also refer to an incident at the restaurant in July 2023 with a white employee named Hakon Vigander.  [Doc. 50-9 at 1; Doc. 1 at 5].  The Plaintiff asserts that Vigander grabbed his neck, choked him, punched him, and kicked him on the shin.  [Doc. 50-9 at 1; Doc. 1 at 5].  However, the Plaintiff has also provided the Court with surveillance video of that incident, which unambiguously shows that Vigander did not, in fact, grab his neck, choke him, punch him, or kick him on the shin. [Doc. 56].  Instead, the video shows that the Plaintiff made contact with Vigander's chest, and Vigander responded by pushing the Plaintiff.  [Id.].  The Plaintiff's manager previously reviewed the footage and concluded that the Plaintiff was responsible for initiating the confrontation but nevertheless demoted Vigander from his managerial position for his conduct.  [Doc. 50-6 at 1].  Moreover, the Plaintiff never filed an EEOC charge regarding this incident.  Accordingly, the Court concludes that the July 2023 incident cannot reasonably be included in the unwelcome conduct that forms the basis of the Plaintiff's hostile work environment claim.  The Plaintiff has also alleged that his manager once left a firearm on the manager's desk for the Plaintiff to see and that his manager cut his hours once the Plaintiff started working as a line cook at a higher rate of pay.  [Doc. 1 at 2-3]. Neither allegation was included in the Plaintiff's Charge, however, and the Plaintiff has not forecast evidence sufficient to establish either allegation, let alone any relationship of those allegations to discrimination.  Accordingly, the Court concludes that these allegations are also not part of the consideration of unwelcome conduct in the context of the Plaintiff's hostile work environment claim.

17

50-3 at 13]. The Plaintiff concedes, however, that he does not know why Bethea initially followed him and that he "do[es] not know [Bethea's] motivation" for the June 18, 2024 incident. [Doc. 50-3 at 16]. The Plaintiff has failed to forecast any evidence that Bethea's conduct was based on the Plaintiff's sex, color, or national origin. Therefore, other than Bethea's use of racial slurs, there is no forecast of evidence that the unwelcome conduct at issue was based on one of the Plaintiff's protected characteristics. To the extent the Plaintiff has a hostile work environment claim, it must arise from the racial slurs and related conducted directed at the Plaintiff by Bethea on June 18, 2024.

As to the third element, which concerns the severity and pervasiveness of the unwelcome conduct, the Plaintiff expressly bases his hostile work environment on the June 18, 2024 incident with Bethea, and not on any other workplace conduct. [Doc. 54 at 2-3]. Generally, "the mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 21 (internal quotation marks omitted). The severity and pervasiveness of the conduct at issue is determined by looking "at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>EEOC v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks omitted). Neither "the sporadic use of abusive language" nor "isolated incidents (unless extremely serious) . . . amount to discriminatory changes in the terms and conditions of employment." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Here, the isolated incident with Bethea was objectionable, but it was relatively brief, did not impede the Plaintiff from finishing his work for the evening, and the Plaintiff reported no physical injuries. The Plaintiff's own text messages indicate that, directly after the events in question, the Plaintiff was "not worried about" Bethea, that his job was nevertheless "going great," that he forgave Bethea, and that he did not want "to see [Bethea] lose his job." [Doc. 50-5 at 42]. The Plaintiff also subsequently testified that he and Bethea had not had any prior disagreements. [Doc. 50-3 at 13-14]. Accordingly, the Court concludes as a matter of law that the conduct at issue was not sufficiently severe or pervasive so as to establish the third element of the Plaintiff's hostile work environment claim.

Finally, as to the fourth element, which concerns whether the unwelcome conduct may be imputed to the employer, the Plaintiff testified

19

during his deposition that one of his supervisors witnessed the June 18, 2024 incident, but he also testified that he had never had prior disagreements with Bethea. [Doc. 50-3 at 13-14]. "On the fourth element for establishing employer liability, [the Fourth Circuit] ha[s] repeatedly held that an employer cannot be held liable for isolated remarks of its employees unless the employer knew or should have known of the harassment, and took *no* effectual action to correct the situation." Spicer v. Com. of Va., Dep't of Corr., 66 F.3d 705, 710 (4th Cir. 1995) (internal quotation marks omitted) (emphasis in original). Here, because the Plaintiff and Bethea had no prior disagreements, there was no prior unwelcome conduct by Bethea, so the Defendant could not have known about the unwelcome conduct until it occurred on June 18, 2024. After the Plaintiff informed the Defendant about the incident, the Defendant attempted to address the issue the following day by ensuring that Bethea would not be working at the same time as the Plaintiff. [Doc. 50-6 at 3; Doc. 50-8 at 2-4]. This undisputed forecast of evidence establishes that the Defendant did, in fact, take effectual action to correct the situation once the Defendant had knowledge of the issue. As a result, the Court concludes that the Plaintiff has also failed to forecast evidence sufficient to establish the fourth element of his hostile work environment claim.

Accordingly, viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that the forecast of evidence is insufficient for a reasonable jury to determine that the unwelcome conduct at issue was sufficiently severe or pervasive, or imputable to the Plaintiff's employer, to entitle the Plaintiff to relief on his hostile work environment claim. The Court will therefore grant summary judgment in favor of the Defendant as to this claim.

### 2. Wrongful Termination

Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Absent direct evidence of an employer's discrimination, a plaintiff may present evidence giving rise to an "inference" of unlawful discrimination under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). "The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff

to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). To establish a *prima facie* case of discrimination, the Plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010). Here, the Plaintiff has not forecast direct evidence of discrimination, so the McDonnell Douglas framework applies.[3] The first and third elements of the *prima facie* case are not in dispute—the Plaintiff is an African American black male whose employment was terminated—so the Court considers only the second and fourth elements.

The parties dispute whether the Plaintiff's job performance was satisfactory prior to his termination. The Defendant contends that the Plaintiff has a history of attendance issues that culminated in abandoning his shift early on June 19, 2024, and that the Plaintiff also has a history of conduct

---

[3] The Plaintiff "objects to the Defendant asserting the McDonnell framework, and says that the defendant employer may be facing a direct employment discrimination claim," but the Plaintiff also concedes that "it is unlikely this may be the case." [Doc. 54 at 6]. The only direct evidence of the cause of the Plaintiff's termination, however, indicates that the Plaintiff's employment was terminated because he had a history of attendance issues and incidents with other employees.

problems, including confrontations with co-workers and poor interactions with management staff.  [Doc. 50-1 at 18-19].  The Plaintiff contends that his food safety certification and his progression from a dishwasher making $16 per hour to a line cook making $19 per hour show that, in general, his job performance was satisfactory, and that prior to his termination the only written reprimand he had received was for wearing headphones at work. [Doc. 54 at 4-5; Doc. 50-5 at 44-45].  The Plaintiff need not "show that he was a perfect or model employee," but rather "only that he was qualified for the job and that he was meeting his employer's legitimate expectations." Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019).  Here, while the Plaintiff's general attendance issues are documented by text messages between the Plaintiff and his manager, the text messages also show a pattern of lenience by the Plaintiff's manager without reprimands informing the Plaintiff that he was falling short.  Moreover, the only forecast of evidence regarding the Plaintiff's prior incidents with coworkers is a declaration of such by the Plaintiff's manager and a video of an incident from July 2023, and such evidence is countered by the absence of any incident reports regarding the Plaintiff's conduct.  The Plaintiff does not dispute, however, that he left his June 19, 2024 shift early, despite being told that Bethea would not be working with him.  As a result, the undisputed forecast

of evidence shows that, on June 19, 2024, the Plaintiff did not meet his employer's legitimate expectations, and that the Plaintiff was terminated two days later. Accordingly, the Plaintiff cannot establish the second element of his wrongful termination claim.

Moreover, the Plaintiff has not forecast any evidence that he received different treatment from similarly situated employees outside his protected class. "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haynes, 922 F.3d at 223–24 (internal quotation marks omitted). Although Bethea was also involved in the June 18, 2024 incident and was not terminated, Bethea, as an African American black male, is within the same protected class as the Plaintiff, and Bethea did not leave a subsequent shift early. The Plaintiff has argued in briefing that the individual hired by the restaurant to replace the Plaintiff "was not in the same protected class as the plaintiff," but the Plaintiff has not presented a forecast of evidence that could establish such fact. [Doc. 54 at 5]. Instead, the Plaintiff appears to rely solely on the *absence* of a forecast by the Defendant that the Plaintiff's position was filled by "another

African-American or colored line cook, with the SAME qualifications as the plaintiff."  [Id. at 6].  That is not sufficient, however, to create a disputed question of material fact as to the fourth element of the Plaintiff's wrongful termination claim.  Accordingly, the Court concludes that the Plaintiff has failed to identify and produce any evidence of a valid comparator, and, thus, the Plaintiff has failed to establish a *prima facie* case of discrimination.

Even if the Plaintiff could establish a *prima facie* case, the Plaintiff has not forecast any evidence to counter the Defendant's legitimate basis for his termination—namely, leaving his June 19, 2024 shift early—as pretext. "While reviewing the employer's articulated reasons for discharge and the plaintiff's refutation thereof, we must keep in mind that 'Title VII is not a vehicle for substituting the judgment of a court for that of the employer.'" DeJarnette v. Corning Inc., 133 F.3d 293, 298–99 (4th Cir. 1998) (quoting Jiminez v. Mary Washington Coll., 57 F.3d 369, 377 (4th Cir.1995)). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981).  Here, nothing in the forecasts of evidence indicates that a reasonable jury could find that the Plaintiff successfully carried that burden.  Accordingly, because the Plaintiff can neither establish a *prima facie* case nor rebut the

Defendant's legitimate reason for his termination, the Court will grant summary judgment in favor of the Defendant as to the Plaintiff's wrongful termination claim.

### 3. Retaliatory Termination

Title VII makes it unlawful for an employer to retaliate against an employee because the employee opposed an unlawful employment practice or because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). The McDonnell Douglas framework also applies to Title VII retaliation claims. Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021). To prove a *prima facie* claim of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the employment action. Coleman, 626 at 190.

Here, at the time of the Plaintiff's termination, he had not made a charge, testified, assisted, or participated in a Title VII proceeding, so his retaliation claim must arise from opposition to an unlawful employment practice. Such opposition includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to

bring attention to an employer's discriminatory activities." <u>Laughlin v. Metro. Washington Airports Auth.</u>, 149 F.3d 253, 259 (4th Cir. 1998). To determine whether an employee's conduct was "legitimate opposition activity," the Fourth Circuit balances the need "to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to ties the hands of employers in the objective selection and control of personnel." <u>Id.</u> (internal quotation marks omitted). Here, if the Plaintiff had complained about Bethea's conduct to his supervisor and manager such that this could reasonably be construed as complaints about discrimination, such complaints could hypothetically be considered protected activity. However, the Plaintiff's decision to leave his June 19, 2024, shift early, after having been informed that he would not be working with Bethea, was *not* protected activity. Nor was any complaint by the Plaintiff about the Defendant's legitimate expectation that the Plaintiff complete his June 19, 2024 shift. <u>See</u> <u>Chang Lim v. Azar</u>, 310 F. Supp. 3d 588, 604 (D. Md. 2018) ("Complaints about management activities that would not constitute unlawful discrimination do not count as protected activity.").

The forecast of evidence is unclear as to whether the Plaintiff's supervisor and manager understood the Plaintiff's complaints about the June 18, 2024 incident to be complaints of discrimination. However, even if the

Defendant's management understood that the Plaintiff was complaining about discrimination by Bethea, there is no forecast of evidence that the Plaintiff's *complaints* were causally linked to the Plaintiff's termination, let alone the but-for cause, as is ultimately required for a retaliation claim. See Strothers v. City of Laurel, Maryland, 895 F.3d 317, 335 (4th Cir. 2018). Instead, the forecast of evidence establishes that the Defendant attempted to address the Plaintiff's complaints by ensuring that the Plaintiff would not work with Bethea the next day.

Accordingly, the Plaintiff has not forecast evidence sufficient for a reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, to conclude that the Plaintiff has established a retaliatory termination claim. The Court will therefore grant summary judgment in favor of the Defendant as to this claim.

### C.     Motion to Seal

On July 13, 2026, the Plaintiff filed a motion to seal one exhibit attached to his brief in opposition to the Defendant's motion for summary judgment. [Doc. 55]. The exhibit that the Plaintiff seeks to seal is a June 21, 2024 text message from the Plaintiff's manager to the Plaintiff. [Doc. 54-6]. The only reason the Plaintiff seeks to seal the exhibit is because the exhibit contains his manager's phone number. [Doc. 55 at 1]. The Plaintiff simultaneously

28

filed a copy of the text message with his manager's phone number redacted. [Doc. 54-5 at 2]. Moreover, the Defendant previously filed a copy of the text message as an exhibit in support of the Defendant's motion for summary judgment. [Doc. 50-5 at 43-44]. Because the parties do not dispute that the text message was sent by the Plaintiff's manager, the filing of a sealed version of the message with the manager's phone number unredacted is unnecessary. Accordingly, the Court will deny the Plaintiff's motion to seal as moot, and the exhibit filed under provisional seal [Doc. 54-6] will be stricken.

## V. CONCLUSION

The Plaintiff has failed to forecast evidence sufficient for a reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, to find that the Plaintiff is entitled to relief on his hostile work environment, wrongful termination, or retaliatory termination claims. The Court will grant summary judgment in favor of the Defendant on all the Plaintiff's claims, which will be dismissed with prejudice.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment is hereby **GRANTED**, and the claims in the Plaintiff's Complaint and "Complaint #2" are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion to Seal is hereby **DENIED AS MOOT**. The exhibit filed under provisional seal [Doc. 54-6] is hereby **STRICKEN** from the record.

A Judgment consistent with the Memorandum of Decision and Order shall be entered contemporaneously herewith.

The Clerk is respectfully requested to close this civil case.

**IT IS SO ORDERED**.

Signed: August 10, 2026

Martin Reidinger
Chief United States District Judge